**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| **EGLA CORP.,** | **Case No. 1:26-cv-1044** |
| **Plaintiff,** | |
| **v.** | **COMPLAINT FOR PATENT INFRINGEMENT** |
| **STINGRAY GROUP INC. f/k/a STINGRAY DIGITAL GROUP, INC., STINGRAY MUSIC USA, INC., and MOOD MEDIA LLC f/k/a MOOD MEDIA CORPORATION,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

Plaintiff EGLA CORP. ("Plaintiff" or "EGLA CORP"), by and through its undersigned counsel, brings this action for patent infringement against Defendants Stingray Group, Inc. f/k/a Stingray Digital Group, Inc. ("Stingray Group"), Stingray Music USA, Inc. ("Stingray Music") (Stingray Group and Stingray Music, collectively "Stingray"), and Mood Media LLC f/k/a Mood Media Corporation ("Mood Media") (Stingray and Mood Media, collectively "Defendants"), and alleges as follows:

## INTRODUCTION

1. This is an action for patent infringement under the patent laws of the United States, 35 U.S.C. § 100 et seq., arising from Defendants' unauthorized use of patented technology invented by Dr. Hernandez for the cloud-based delivery of multimedia content, including music and audio-visual channels, to cable television operators, satellite television operators, IPTV systems, and over-the-top service providers.

2. From approximately 2012 through 2014, Dr. Hernandez developed innovative technology to deliver audio and video content using cloud-based platforms and mobile applications using secure remote servers. Beginning in December 2014, Dr. Hernandez filed for patent protection for his technological innovations and has received approval of more than 94

claims across four (4) U.S. Patents and 8 claims in a European Patent covering 17 jurisdictions.

3. One of those United States patents is the subject of this action: U.S. Patent No. 12,075,116 (the "'116 Patent" or "Asserted Patent"), entitled "Method, System and Apparatus for Multimedia Content Delivery to Cable TV and Satellite Operators," which duly and lawfully issued from the United States Patent and Trademark Office on August 27, 2024. A true and correct copy of the '116 Patent is attached as Exhibit A.

4. The '116 Patent is a continuation of U.S. Patent Application No. 16/729,986, filed on December 30, 2019, which issued as U.S. Patent No. 11,140,441 (the "'441 Patent"). The '441 Patent is itself a continuation of the application that issued as U.S. Patent No. 10,524,002 (the "'002 Patent"), which in turn is a continuation of the application that issued as U.S. Patent No. 10,123,074 (the "'074 Patent"). The '116 Patent therefore claims priority to, and shares a common specification with, the '074 Patent, '002 Patent, and '441 Patent.

5. Defendants Stingray and Mood Media acquired unauthorized access to Dr. Hernandez's proprietary technology in connection with Stingray's acquisition of certain assets of Defendant Mood Media, who was using Dr. Hernandez's proprietary technology under an agreement with Dr. Hernandez's company EGLA CORP. Stingray has used, and continues to use, that technology—including the technology claimed in the '116 Patent—in its cloud-based multimedia streaming platform known as "UbiquiCAST OSE2" (also referred to as "Ubiquicast"). Through its UbiquiCAST OSE2 platform, Stingray has become the leading provider of music services to cable television operators, offering music and audio-visual channels to over 700 operators worldwide and, on information and belief, more than 400 million subscribers in 156 countries.

6. From 2014 to 2024, Stingray increased its revenues from approximately C$15 million per quarter to C$100.4 million per quarter and increased its customer base to at least 413 operators, generating approximately US$37.1 million per quarter in revenues in the United States. These revenues, and the infringing products and services that generated them, have been made possible by Defendants' use of Dr. Hernandez's patented technology.

7.  Plaintiff brings this action to stop Defendants' continuing infringement of the '116 Patent and to recover the damages to which Plaintiff is entitled under 35 U.S.C. § 284, including enhanced damages for willful infringement, together with attorneys' fees under 35 U.S.C. § 285, pre- and post-judgment interest, and costs of suit.

## **PARTIES**

8.  Plaintiff EGLA CORP is a Florida corporation with its principal place of business at 4890 NW 101st Avenue, Coral Springs, Florida. EGLA CORP is the owner by assignment of all right, title, and interest in and to U.S. Patent No. 12,075,116, including all rights to bring this suit for injunctive relief and damages and to recover past and future damages for infringement of the '116 Patent.

9.  The named inventor of the '116 Patent is Dr. Edwin A. Hernandez-Mondragon ("Dr. Hernandez"), an individual and a resident of Coral Springs, Florida. Dr. Hernandez holds a Ph.D. in Computer Engineering from the University of Florida, is a Fulbright scholar, and is the named inventor of multiple issued United States and foreign patents, including the '116 Patent. Dr. Hernandez assigned his right, title, and interest in and to the '116 Patent to EGLA CORP. Dr. Hernandez founded and, from 1997 to 2023, operated a 10,000 square-foot technology incubator and accelerator in Boca Raton, Florida known as the "EGLAVATOR."

10.  On information and belief, Defendant Stingray Group, Inc. f/k/a Stingray Digital Group, Inc. is a Canadian corporation with its principal place of business at 730 Wellington Street, Montreal, Quebec, Canada H3C 1T4. Stingray Group has over 250 employees across the world and is doing business in the United States, in the State of Texas, and in this judicial district.

11.  On information and belief, Defendant Stingray Music USA, Inc. is a Delaware corporation with its principal place of business at 2127 Ayrsley Town Blvd., Suite 202, Charlotte, North Carolina 28273. Stingray Music is doing business in the United States, in the State of Texas, and in this judicial district.

12.     On information and belief, Defendant Mood Media LLC f/k/a Mood Media Corporation is a Texas limited liability company with its principal place of business at 2100 S. IH 35, Suite 201, Austin, Texas 78704. Mood Media is a resident of the State of Texas and maintains a regular and established place of business in this judicial district.

## JURISDICTION AND VENUE

13.     This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1 et seq., including 35 U.S.C. § 271 and § 281. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

14.     This Court has personal jurisdiction over Defendant Mood Media because Mood Media is a Texas entity and maintains its principal place of business in this District at 2100 S. IH 35, Suite 201, Austin, Texas 78704. Mood Media has purposefully availed itself of the privileges of conducting business in Texas and in this District, and a substantial part of the events giving rise to the claims asserted herein occurred in this District.

15.     This Court has personal jurisdiction over Defendants Stingray Group and Stingray Music because, among other things, they have done and continue to do business in the State of Texas and in this judicial district; have committed and continue to commit acts of patent infringement in the State of Texas and in this judicial district, including by making, using, offering to sell, selling, and/or importing infringing products and services (including the accused UbiquiCAST OSE2 platform and related streaming services) in or into the State of Texas and in this judicial district; derive substantial revenues from goods and services provided to customers in the State of Texas and in this judicial district; and have purposefully availed themselves of the privilege of conducting business in the State of Texas. Further, Stingray acquired the assets of Mood Media's DMX Music business (upon which Stingray's accused infringing platform is built) from Mood Media, which has been and is headquartered in this District.

16.     On information and belief, Defendants Stingray Group and Stingray Music regularly transact business with cable television operators, satellite television operators, IPTV operators, and over-the-top service providers that operate in Texas and in this District, and

deliver streaming audio and audio-visual programming to subscribers in Texas and in this District through the accused UbiquiCAST OSE2 platform.

17.    Venue is proper in this District under 28 U.S.C. § 1400(b) because Mood Media resides in this District and maintains a regular and established place of business in this District at 2100 S. IH 35, Suite 201, Austin, Texas 78704, and has committed acts of infringement in this District. Venue is proper in this District as to Stingray Group, a foreign corporation with no offices in the United States, under 28 U.S.C. § 1391(c)(3), which provides that "a defendant not resident in the United States may be sued in any judicial district." See also *In re HTC Corp.*, 889 F.3d 1349 (Fed. Cir. 2018). Venue is proper in this District as to Stingray Music under 28 U.S.C. § 1400(b) because Stingray Music has committed acts of infringement in this District and, on information and belief, has a regular and established place of business in this District through, among other things, its continuing operations based upon and integrated with the assets, personnel, facilities, and customers acquired from Mood Media's DMX Music business, which is and was headquartered in this District.

18.    On information and belief, Mood Media's operations in this District include corporate headquarters functions, executive and managerial decision-making, engineering and technical personnel, sales and licensing operations relating to the DMX Music-branded products and services, and the maintenance of records, documents, source code repositories, agreements, and other information directly relevant to the claims asserted herein. A substantial part of the events giving rise to Plaintiff's claims occurred in or was directed from this District, including the negotiation and execution of Plaintiff's 2012 Mutual Non-Disclosure Agreement with DMX Music (which was at that time headquartered at 703 W. 5th Street, Suite 600, Austin, Texas 78703 — approximately three miles from Mood Media's current headquarters); Mood Media's negotiation, execution, and performance of its subsequent agreements with Plaintiff relating to the DMX Music platform; Mood Media's decisions concerning the transfer, use, and disposition of the DMX Music assets; Mood Media's continuing development, operation, and provision of the Mood Harmony, Mood Visuals, Harmony CMS, and ProFusion product lines; and the integration of the former DMX Music assets into the accused UbiquiCAST OSE2 platform operated by Stingray.

19. On information and belief, Stingray Defendants make, use, offer for sale, sell, and/or import the accused UbiquiCAST OSE2 platform and related infringing products and services in or into this District, including by: (a) delivering streaming music and audio-visual programming to cable television, satellite, IPTV, and over-the-top service providers operating within this District; (b) delivering streaming music and audio-visual programming to subscribers located within this District; (c) marketing, selling, supporting, and servicing the Accused Instrumentalities to customers and prospective customers located within this District; and (d) receiving revenues from sales, licenses, subscriptions, and other commercial activity tied to end users and operators located within this District. Stingray's Ubiquicast servers, which Stingray states are "set-up and configured to each client's specific requirements before being shipped to head-ends," include or have included deployments reaching operators and subscribers in this District.

## FACTUAL BACKGROUND

### A.   Dr. Hernandez's Background and Technology Development

20. Dr. Hernandez is an inventor, engineer, and entrepreneur who has spent more than two decades designing, architecting, and implementing cloud-based platforms for multimedia delivery. Since 2010, Dr. Hernandez has continuously developed, architected, and implemented cloud-based platforms for multimedia content delivery.

21. In or around 2012, a company called DMX Music ("DMX"), then headquartered at 703 W. 5th Street, Suite 600, Austin, Texas 78703 — within this District — was having financial troubles and was using approximately 50 desktop computers to broadcast music-only content to cable operator affiliates using satellite delivery systems and antiquated hardware and software. DMX's management met with Dr. Hernandez to see if something could be done. Dr. Hernandez proposed a software-defined solution to replace hardware encoders and satellite delivery, including a new cloud-based platform that would use cloud services, mobile applications, and web-based technologies. On March 1, 2012, EGLA CORP (operating as EGLA Communications) and DMX entered into a Mutual Non-Disclosure Agreement governing the exchange of Dr. Hernandez's proprietary and confidential information, attached hereto as Exhibit B. The Non-Disclosure Agreement expressly

provided that "[n]o licenses or rights under any patent, copyright, trademark, or trade secret" were granted or implied by the agreement.

22. In March 2012, DMX was acquired by Defendant Mood Media for approximately $86.1 million cash. After the acquisition, Mood Media continued to use the DMX brand and platform and continued Dr. Hernandez's ongoing work using web-based technologies and mobile applications, including a web-based platform called "DMX2GO," a "Mediamplify Music" mobile application, "DMX2GO Widgets," and several set-top-box projects.

23. Dr. Hernandez was the main software developer, architect, and sole provider of these technologies to Mood Media. Dr. Hernandez deployed several versions of his software and conducted testing and integration at cable and satellite television systems where Mood Media had clients, including DirecTV in California and Cablevision in Mexico City, using real head-end equipment connected to end-user set-top boxes.

24. The first version of Dr. Hernandez's software was music-only and did not deliver visual assets. Beginning in 2013, Dr. Hernandez developed the first prototype, wrote a specification, and implemented a Python-based software platform to manage HTML-based screen enhancements for cable television and satellite operators. Dr. Hernandez finalized this work in or around May 2014.

25. Around 2013, Dr. Hernandez developed a real-time solution that generated on-the-fly video assets with metadata and other widgets and broadcast those assets to set-top-boxes and other IPTV systems. After multiple iterations, Dr. Hernandez determined that using a headless rendering engine and incorporating web assets was the most efficient approach for a real-time, scalable solution.

26. Dr. Hernandez incorporated a solution that relied on web user interfaces and JavaScript for on-screen animations and updates. Dr. Hernandez demonstrated the results of this solution in operation at cable operator Cablevision Mexico in March 2014.

27. Dr. Hernandez's novel approach used a single arrangement of servers—two or three—to generate and encode all music and audio-visual channels, as compared to the approximately 50 desktop servers with ASI (Asynchronous Serial Interface) cards used by DMX and other

industry participants at the time. The new platform was software-driven, replacing proprietary hardware encoders and satellite delivery with a flexible, software-defined, cloud-based architecture that supported web, mobile, and cable TV distribution through a unified system with shared resources.

28. Dr. Hernandez's inventions include, among other things, the generation of visual representations with background images generated using web-based elements, where the screens displayed at set-top boxes and Smart TVs are generated with images, HTML, and styles from a web page that are displayed and broadcast over a multicast address, compatible with MVPD operators. Dr. Hernandez's inventions also include the use of virtual machines, headless browsers, M3U8 streaming, fault-tolerance, MPEG-based multiplexers, caching units, multicast servers, unicast servers, CSS, HTTP, JSON, H.264 encoders, MPEG-2 video encoders, and many other innovations disclosed in the '116 Patent and its related patents.

**B. U.S. Patent No. 12,075,116**

29. On August 27, 2024, the United States Patent and Trademark Office duly and lawfully issued U.S. Patent No. 12,075,116, entitled "Method, System and Apparatus for Multimedia Content Delivery to Cable TV and Satellite Operators." A true and correct copy of the '116 Patent is attached as Exhibit A.

30. The '116 Patent names Dr. Hernandez as the sole inventor. Dr. Hernandez assigned his right, title, and interest in and to the '116 Patent to EGLA CORP. EGLA CORP is the sole and exclusive owner of all right, title, and interest in and to the '116 Patent, including the right to recover past damages, the right to bring this suit for injunctive relief and damages, and the right to enforce the patent.

31. The '116 Patent claims priority to, and is a continuation of, U.S. Patent Application No. 16/729,986, filed on December 30, 2019 (issued as the '441 Patent), which in turn is a continuation of the applications that issued as the '002 Patent and the '074 Patent. The '116 Patent therefore shares a common written description and specification with the '074, '002, and '441 Patents, and claims the benefit of the earliest effective filing date of the parent applications.

32. The '116 Patent contains 34 claims, including two independent claims: independent claim 1, directed to a method of providing a media stream from a computing system comprising a caching unit and at least one multicasting server; and independent claim 18, directed to a system comprising a caching unit, at least one multicasting server, and a computer-readable storage medium storing executable instructions. The independent claims of the '116 Patent recite a distinct "self-refreshing" multimedia workflow — requiring the system, after saving multimedia items at the caching unit, to (i) detect changes at the source websites, (ii) retrieve a new plurality of screen captures in response to detected changes, and (iii) reassemble the affected multimedia items into updated multimedia items. These limitations define a scope of protection specific to the '116 Patent and require separate and independent analysis of infringement and validity as to the '116 Patent.

33. The '116 Patent is valid and enforceable and has not been declared invalid or unenforceable by any court or agency of competent jurisdiction.

**C.    Stingray's Acquisition of Mood Media/DMX and Access to Dr. Hernandez's Technology**

34. In the fall of 2013, EGLA CORP and Mood Media (acting through its DMX business) negotiated a term sheet to license Dr. Hernandez's platforms, including those hosted at iWeb and at Equinix data centers, the associated mobile applications, and other web applications, with an option to include future platform development. The term sheet was signed on December 18, 2013. The term sheet made clear that all intellectual property and technology ownership remained with Dr. Hernandez and his companies.

35. During these negotiations, Plaintiff was not informed that a merger transaction was simultaneously being negotiated between Mood Media and Stingray, and that Stingray intended to gain access to Dr. Hernandez's servers, source code, and other proprietary technology via its acquisition of Mood Media's DMX business.

36. In or around March 2014, Dr. Hernandez learned that Mood Media's DMX division was being acquired by Stingray for approximately US$16.3 million. Stingray, on information and belief, had already obtained physical and electronic access to Dr. Hernandez's servers that had been installed at multiple cable television head-ends, including CableMAS,

Cablevision Mexico, AXTEL TV, and Encompass, and to the proprietary source code, configuration files, and technology stored on those servers.

37.   By April 15, 2014, Dr. Hernandez's remote access to his own servers via his pre-established IP tunnels had been severed, and, on information and belief, Stingray had already obtained unauthorized access to and control over servers that contained Dr. Hernandez's proprietary software, including the software architecture, methods, and systems that were later embodied in the claims of the '074 Patent, the '002 Patent, the '441 Patent, and the '116 Patent.

38.   On information and belief, Stingray thereafter developed a new version of its server platform, which it calls "UbiquiCAST OSE2" (to distinguish it from its prior, inferior platform known as "OSE1"). On information and belief, and consistent with Stingray's own prior representations in Music Choice v. Stingray Digital Group Inc., No. 2:16-cv-00586-JRG-RSP (E.D. Tex.), prior to March 2015, Stingray did not offer or provide any music video TV channels to multichannel video programming distributors. By the fourth quarter of 2014, and no later than March 2015, Stingray had deployed UbiquiCAST OSE2, a new platform that, on information and belief, incorporates the architecture, methods, and systems disclosed in the '116 Patent (and its related patents).

**D.     Stingray's UbiquiCAST OSE2 Platform and Its Commercial Deployment**

39.   On information and belief, Stingray makes, uses, operates, maintains, sells, offers for sale, and imports into the United States a cloud-based multimedia delivery platform known as UbiquiCAST OSE2 (and related server products and services), which Stingray provides to cable television operators, satellite television operators, IPTV operators, and over-the-top service providers for the delivery of streaming music and audio-visual channels to end-user subscribers in the United States, including subscribers in this District.

40.   On information and belief, Stingray's UbiquiCAST OSE2 platform includes one or more caching units (including components that Stingray internally refers to as a "StillPict Generator," a "ubimetaserver," and "ubiquicast" components), one or more multicasting servers, and computer-readable storage media that store instructions enabling the system to perform the functions recited in the claims of the '116 Patent.

41.    On information and belief, Stingray's UbiquiCAST OSE2 platform performs the following functions, among others:

a.    receives requests, at a caching unit, from one or more multicasting servers for at least one media stream for playback on a broadcast media channel, including requests that specify a particular format;

b.    obtains content from the internet corresponding to a plurality of multimedia items from one or more websites offering the content in at least one first format;

c.    retrieves, for each multimedia item, at least one audio file corresponding to an audio component and a plurality of screen captures corresponding to a video component;

d.    renders a webpage using a browser and generates a plurality of screen captures of the rendered webpage using a headless rendering engine;

e.    generates, at the caching unit, the plurality of multimedia items in the requested format by assembling a video component from the plurality of screen captures, combining the screen captures and the audio file, and saving the multimedia item at the caching unit;

f.    provides at least one media stream to a content provider for multicasting on a broadcast media channel, including by assembling the media stream in the requested format using the plurality of multimedia items saved at the caching unit;

g.    detects changes at the websites corresponding to the multimedia items saved at the caching unit; and

h.    in response to detecting a change, retrieves new screen captures and reassembles the multimedia item using the new screen captures, thereby creating an updated multimedia item.

42.    Stingray's internal project management and trouble-ticket records (including records from Stingray's internal JIRA instance at https://jira-stage.corp.stingraydigital.com and from a Trello board used by Stingray personnel located at https://trello.com/b/89nC7n95/telesur-check-list) reflect that the UbiquiCAST OSE2 platform includes, among other things, an

HTTP Live Streaming (HLS) multicast unit, an MPEG Transport Stream multiplexer, still-image/"StillPict" caching and generation components, PNG background image processing (including use of a "/data/stillpic/background" directory), FFMPEG-based encoding, MONIT monitoring, H.264 video encoding, AC-3 audio encoding, multicast IP addressing, configurable GOP sizes, and use of cloud services (including Amazon Web Services) for storage and distribution. On information and belief, the specific combinations, configurations, and interactions of these open-source and commercial components reflected in Stingray's JIRA and Trello records are characteristic of the idiosyncratic architecture embodied in Dr. Hernandez's implementation of the technology later claimed in the '116 Patent, and include configurations and error patterns that, on information and belief, would not arise in a platform developed independently of Dr. Hernandez's technology.

43.    On information and belief, Stingray's UbiquiCAST OSE2 platform is deployed at cable television operators and IPTV providers throughout the United States, including at AT&T (which has offered Stingray-provided music channels 5100 to 5174 on its AT&T U-verse® service from 2014 through 2024), Millicom International Services, LLC (which operates under the trade name "TIGO" in Latin America and offers mobile and television streaming products using UbiquiCAST OSE2), and Blue Stream Communications, LLC (d/b/a Blue Stream Fiber), as well as more than 700 cable operators worldwide serving over 400 million subscribers in 156 countries.

44.    On information and belief, Stingray's content delivery platform incorporated source code components developed by Dr. Hernandez at least as early as August 2013, and has continued to rely on those components (and on technology derived from or built upon those components) from that time through the present. The architecture, methods, and functionality embodied in those components are the same architecture, methods, and functionality that Dr. Hernandez subsequently claimed, and to which EGLA CORP now holds the exclusive rights, in the '116 Patent and its parent patents in the same patent family.

**E.    Mood Media's Mood Harmony, Mood Visuals, and ProFusion Platforms and Their Commercial Deployment**

45.    In addition to the technology Mood Media caused to be transferred to Stingray in 2014, Mood Media itself makes, uses, offers for sale, and sells in the United States (including within this District) a suite of cloud-based multimedia streaming products and services that independently practice the inventions claimed in the '116 Patent. These include, without limitation, Mood Media's "Mood Harmony" content management and streaming platform (accessible at https://harmony.moodmedia.com), Mood Media's "Mood Visuals" digital signage and visuals offering, the Harmony content management system ("Harmony CMS"), and Mood Media's "ProFusion" line of media players (including the ProFusion iH, ProFusion iQ, ProFusion iS, ProFusion iO, and Harmony MAVP-B2 models), together with the associated Harmony media player software, firmware, publishing workflows, and cloud services (collectively, the "Mood Harmony Platform").

46.    On information and belief, the Mood Harmony Platform includes one or more caching units (including locally-cached content on the Harmony media players themselves and cloud-based caches at Mood Media's Harmony CMS), one or more multicasting servers (including Mood Media's use of multicast DNS, or "mDNS," via the ".local" top-level domain, such as https://profusion-<DEVICEID>.local, as documented in Mood Media's published support materials), and computer-readable storage media storing instructions which, when executed, cause the Mood Harmony Platform to receive requests for media streams in a requested format, obtain content from the internet (including from Mood Media's cloud infrastructure hosted at AWS CloudFront and at AWS US East (Northern Virginia), as well as bsn.cloud, brightsignnetwork.com, mvision-us.moodmedia.com, and harmony.moodmedia.com), retrieve audio and screen-capture content for each of a plurality of multimedia items, render Mood Visuals templates (which are HTML-based and include images, text, live feeds, RSS feeds, Twitter feeds, and weather feeds) using a browser, generate a plurality of screen captures using a headless rendering engine, assemble and save the multimedia items at a caching unit in the requested format (including H.264 MP4 and MOV formats at 29.97 frames per second and 10–20 Mbps constant bit rate), provide media streams for multicasting to commercial subscriber premises, detect changes to web-hosted Mood Visuals content, retrieve new screen captures in response to detected changes, and reassemble affected multimedia items into updated multimedia items for delivery to end users.

47. On information and belief, Mood Media operates the Mood Harmony Platform from and through its Austin, Texas headquarters. Mood Media provides Mood Harmony Platform services to hundreds of thousands of commercial subscriber locations across the United States, including, without limitation, retail stores, hotels, malls, restaurants, and other commercial venues. On information and belief, Mood Media delivers the Mood Harmony Platform to numerous commercial subscriber locations within this District, including throughout the Austin metropolitan area and other cities within the Western District of Texas.

48. A preliminary infringement claim chart showing how the Mood Harmony Platform infringes at least claim 1 of the '116 Patent is attached as Exhibit E.

**F.    Defendants' Knowledge of the '116 Patent and Its Parent Patents**

49. On information and belief, two individuals served as a continuous employment link across DMX, Mood Media, and Stingray during the 2011–2014 period in which Dr. Hernandez's patented technology was developed and embodied in servers, source code, and documentation. Gustavo Tonelli served successively as General Manager of DMX Latin America (through March 8, 2012), as Managing Director of Mood Media (from March 9, 2012 through January 2, 2014), and as Vice President and General Manager, Latin America of Stingray (from January 6, 2014 onward). Alejandro Cacciola served as General Manager, Latin America of Mood Media (from May 3, 2010 through December 31, 2013), and as Director of Operations and Content of Stingray (from January 3, 2014 onward). The transitions of both individuals from Mood Media to Stingray occurred essentially without gap — Tonelli's Stingray role began approximately three weeks after he signed the EGLA-Mood Media term sheet on December 18, 2013 as a Mood Media representative.

50. On information and belief, Messrs. Tonelli and Cacciola, during their tenures at Mood Media, had access to and knowledge of the technology, documentation, specifications, and source code developed by Dr. Hernandez and later embodied in the claims of the '116 Patent. When Tonelli and Cacciola transitioned directly from Mood Media to Stingray in January 2014, they carried that knowledge with them into their new executive positions at Stingray. From the outset of Stingray's operation of the accused UbiquiCAST platform,

therefore, Stingray — through at least these two senior executives with direct responsibility for Latin American operations and content — had knowledge of Dr. Hernandez's technology and of its source at EGLA CORP and Dr. Hernandez.

51.     Accordingly, on information and belief, Stingray's knowledge of the technology later claimed in the '116 Patent substantially predated the 2017–2019 licensing discussions described below. From at least January 2014 onward, Stingray had actual knowledge, through its senior Latin American executives, of the technology developed by Dr. Hernandez and of his claim of ownership to that technology.

52.     Beginning in or around 2017, Dr. Hernandez contacted Stingray to offer a license to his patent portfolio and provided Stingray with copies of his U.S. Patent Nos. 10,123,074 and 10,524,002, along with supporting documentation and presentations. On September 15, 2017, EGLA CORP (operating as EGLA Communications) and Stingray Digital Group Inc. entered into a Mutual Non-Disclosure Agreement in connection with those discussions, signed by Stingray's SVP and General Counsel Lloyd Feldman and attached hereto as Exhibit C. In 2018, after the issuance of the '074 Patent, Dr. Hernandez offered to license his patent portfolio and include all source code. On July 12, 2019, Dr. Hernandez presented a similar offer to Stingray's Board of Directors. Dr. Hernandez conducted multiple communications with Stingray's technical staff and its Vice President of Legal, Lloyd Feldman, between 2017 and 2019. Despite these repeated communications, Stingray ceased responding and continued its use of the accused UbiquiCAST OSE2 platform.

53.     Stingray has thus had actual knowledge of the technology claimed in the '116 Patent and its parent patents on multiple, independent bases: (a) through the January 2014 transitions of senior executives Gustavo Tonelli and Alejandro Cacciola from Mood Media to Stingray, as described above; and (b) through Dr. Hernandez's direct communications with Stingray's management, technical staff, and Vice President of Legal from 2017 through 2019, in which Dr. Hernandez provided Stingray with copies of U.S. Patent Nos. 10,123,074 and 10,524,002 and offered to license his patent portfolio. Because the '116 Patent is a continuation of, and shares a common specification with, the '074, '002, and '441 Patents, Stingray's knowledge of the parent patents and of the underlying technology translates into knowledge of the subject matter claimed in the '116 Patent. In addition,

Defendants have had actual knowledge of the '116 Patent, and of the specific claims asserted herein, at least as of the service of this Complaint.

54. On information and belief, Mood Media has had actual knowledge of Dr. Hernandez's patent portfolio and patented technology since before Stingray did. Mood Media received Dr. Hernandez's confidential technical information, specifications, and source code in connection with its DMX Music business from 2012 onward, and Mood Media's senior Latin American executives (including Messrs. Tonelli and Cacciola) worked directly with Dr. Hernandez's proprietary technology during that period. Mood Media has had actual knowledge of the '116 Patent at least as of the service of this Complaint.

55. Despite its knowledge of Dr. Hernandez's patent family and his offers to license the technology, Stingray has refused to take a license and has continued to make, use, offer for sale, and sell the accused UbiquiCAST OSE2 platform and related streaming services, which, as detailed herein and in Exhibit D, infringe the '116 Patent.

56. Mood Media, on information and belief, is contractually or otherwise related to the operation, marketing, and distribution of UbiquiCAST OSE2 in connection with the DMX assets it transferred or made available to Stingray, and derives direct or indirect benefit from Stingray's deployment of UbiquiCAST OSE2. Mood Media has had knowledge of Dr. Hernandez's patent portfolio and patented technology through its pre-existing contractual relationship with EGLA CORP, its prior receipt of confidential technical information and source code from Dr. Hernandez, and its subsequent communications with Plaintiff. Mood Media has had actual knowledge of the '116 Patent at least as of the service of this Complaint.

## COUNT I
## INFRINGEMENT OF U.S. PATENT NO. 12,075,116
### (Against All Defendants)

57. Plaintiff incorporates by reference the allegations of paragraphs 1 through 56 as though fully set forth herein.

58. The '116 Patent is attached to this Complaint as Exhibit A.

59.   EGLA CORP is the owner by assignment of all right, title, and interest in and to the '116 Patent, including the right to bring this suit for injunctive relief and damages and to recover past and future damages for its infringement.

60.   The '116 Patent is valid and enforceable.

61.   Direct Infringement (35 U.S.C. § 271(a)). On information and belief, Defendants have directly infringed, literally or under the doctrine of equivalents, and continue to directly infringe one or more claims of the '116 Patent, including at least claims 1 and 18, by making, using, offering for sale, selling, and/or importing into the United States (including in and to this District) products, services, and systems that practice the inventions claimed in the '116 Patent, including without limitation: (i) Stingray's UbiquiCAST OSE2 platform and the related server products, software, and streaming services that Stingray provides to cable television operators, satellite television operators, IPTV operators, and over-the-top service providers; and (ii) Mood Media's Mood Harmony Platform, including the Mood Harmony cloud service (accessible at https://harmony.moodmedia.com), Mood Visuals, the Harmony CMS, and the ProFusion iH, iQ, iS, iO, and MAVP-B2 media players and associated software and cloud services that Mood Media provides to commercial subscribers (collectively, the "Accused Instrumentalities").

62.   A preliminary claim chart illustrating how the Accused Instrumentalities infringe at least claim 1 of the '116 Patent is attached as Exhibit D. This chart is exemplary and is based on presently available public and limited internal information regarding the Accused Instrumentalities; Plaintiff reserves the right to supplement, amend, and expand its infringement contentions following discovery, including as to additional claims of the '116 Patent and as to dependent claims 2 through 17 and 19 through 34.

63.   On information and belief, Defendants make, use, and distribute—or contract with vendors and others to make, use, and distribute—the Accused Instrumentalities. Within this jurisdiction and elsewhere, Defendants and their employees, agents, and affiliates use the Accused Instrumentalities in connection with the design, development, testing, operation, and maintenance of those instrumentalities, as well as in connection with their use by Defendants' customers, agents, affiliates, and end users.

64.    To the extent that any element or step of a claim of the '116 Patent is performed or provided by a party other than Defendants, that element or step is attributable to Defendants because Defendants direct and control the performance and/or receive a benefit from the performance. Defendants establish the manner and timing of the performance of the Accused Instrumentalities, control the architecture, configuration, and operation of the Accused Instrumentalities, and condition the use of the Accused Instrumentalities by their customers and end users upon acceptance of Defendants' terms and conditions. Defendants' contractual relationships with cable television operators, IPTV operators, satellite operators, and end users also give rise to an agency relationship, vicarious liability, or joint enterprise for purposes of direct and joint infringement.

65.    Induced Infringement (35 U.S.C. § 271(b)). On information and belief, at least since the filing of this Complaint, and earlier as to Stingray for the reasons set forth in paragraphs 49 through 54, Defendants have knowingly and actively induced infringement of one or more claims of the '116 Patent by, among other things, designing, programming, manufacturing, marketing, promoting, distributing, providing, servicing, maintaining, and offering the Accused Instrumentalities to their customers (including cable television operators, satellite television operators, IPTV operators, and over-the-top service providers) and to end users, together with instructions, documentation, technical support, training, user agreements, and terms and conditions that direct those customers and end users to use the Accused Instrumentalities in a manner that infringes the '116 Patent. Defendants intend and know that the use of the Accused Instrumentalities by their customers and end users infringes the '116 Patent. Defendants' customers and end users have directly infringed the '116 Patent through that use.

66.    Contributory Infringement (35 U.S.C. § 271(c)). On information and belief, at least since the filing of this Complaint, and earlier as to Stingray for the reasons set forth in paragraphs 49 through 54, Defendants have contributed to the infringement of the '116 Patent by, among other things, making, selling, offering for sale, and importing into the United States the Accused Instrumentalities, which constitute a material part of the inventions claimed in the '116 Patent, with knowledge that the Accused Instrumentalities are especially made or especially adapted for use in infringement of the '116 Patent and are not staple articles

or commodities of commerce suitable for substantial non-infringing uses. The Accused Instrumentalities are purpose-built to provide cloud-based multimedia streaming delivery to cable television operators and similar providers in the infringing manner described herein.

67.    Willful Infringement. Defendants' infringement of the '116 Patent has been, and continues to be, knowing, deliberate, and willful. Stingray has had knowledge of the technology later claimed in the '116 Patent since at least January 2014, when senior Stingray executives Gustavo Tonelli and Alejandro Cacciola transitioned directly from Mood Media to Stingray carrying knowledge of Dr. Hernandez's technology with them. Stingray had further, confirmed knowledge of Dr. Hernandez's patent portfolio as a result of his direct offers to license the technology to Stingray from 2017 through 2019, the parties' September 15, 2017 Non-Disclosure Agreement, Dr. Hernandez's July 12, 2019 presentation to Stingray's Board of Directors, and the subsequent course of dealings and communications between Plaintiff and Stingray. Mood Media has had knowledge of Dr. Hernandez's patented technology since even earlier through its direct receipt of Dr. Hernandez's confidential technical information in 2012 and thereafter. Rather than taking a license, Defendants have continued and expanded their use of the Accused Instrumentalities after issuance of the '116 Patent on August 27, 2024. Defendants have infringed the '116 Patent with knowledge of the '116 Patent (or with reckless disregard of an objectively high likelihood that their actions constituted infringement), entitling Plaintiff to enhanced damages under 35 U.S.C. § 284 and to a finding that this case is exceptional under 35 U.S.C. § 285.

68.    Plaintiff has suffered, and will continue to suffer, substantial damage as a result of Defendants' infringement of the '116 Patent. Under 35 U.S.C. § 284, Plaintiff is entitled to recover damages adequate to compensate for Defendants' infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendants, together with interest and costs as fixed by the Court, and to enhanced damages up to three times the amount found or assessed.

69.    Defendants threaten to continue to engage in the acts complained of herein and, unless restrained and enjoined, will continue to do so, all to Plaintiff's irreparable injury. The

harm to Plaintiff from Defendants' ongoing infringement cannot be adequately compensated by monetary damages alone. Plaintiff is therefore entitled to injunctive relief under 35 U.S.C. § 283.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants, and grant Plaintiff the following relief:

A.   A judgment that Defendants have infringed, and continue to infringe, directly, contributorily, and/or by inducement, one or more claims of U.S. Patent No. 12,075,116 in violation of 35 U.S.C. § 271;

B.   A judgment that Defendants' infringement of U.S. Patent No. 12,075,116 has been willful;

C.   A permanent injunction under 35 U.S.C. § 283 enjoining Defendants, their officers, directors, agents, servants, employees, affiliates, parents, subsidiaries, successors, assigns, and all persons acting in concert or participation with any of them, from further infringement of U.S. Patent No. 12,075,116, including by making, using, offering for sale, selling, and/or importing the Accused Instrumentalities or any other product or service that infringes the '116 Patent;

D.   An award of damages adequate to compensate Plaintiff for Defendants' infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendants, under 35 U.S.C. § 284, together with pre- and post-judgment interest;

E.   An award of enhanced damages up to three times the amount assessed, pursuant to 35 U.S.C. § 284, for Defendants' willful infringement;

F.   A declaration that this is an exceptional case under 35 U.S.C. § 285, and an award to Plaintiff of its reasonable attorneys' fees, costs, and expenses incurred in this action;

G.    An accounting for damages arising from Defendants' infringing activities, including for any sales and use that are not presented at trial; and

H.    Such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: April 22, 2026

Respectfully submitted,


/s/ Robert L. Drolet
**Robert L. Drolet**
Florida Bar No. 1004135
Admitted, U.S. District Court, Western District of Texas
RL DROLET PATENT PROSECUTION SERVICES PLLC
515 E. Las Olas Boulevard, Suite 1301
Fort Lauderdale, Florida 33301
Telephone: (954) 691-0260
Email: rob@rldpatents.com
yanina@rldpatents.com
*Counsel for Plaintiff EGLA CORP.*